May it please the court. I'm Stephen Minster, the appellant, United States. With me is lead trial counsel Robert McGeorge, and I believe I've reserved five minutes. The United States antitrust complaint was dismissed on the pleadings in this case. That was wrong as a matter of law, and it harms United States farmers and consumers. The United States brought this case to enjoin a blatant horizontal non-compete agreement, the restrictive clause. That clause is aimed directly at millions of U.S. consumers who want better winter tomatoes. Well, that's the question, isn't it? Is it direct? And I guess the factual difficulty I'm having with your complaint is that, as I understand it, this is a foreign agreement that purports to restrict the Israeli company from selling these long shelf life tomato seeds to Mexican farmers. So to get to the impact on the U.S. consumer, it's starting to sound to me like we've got an indirect effect as opposed to a direct. Can you help me with that? I'll try to. You're referring to what the district court treated as the foreign side of the case, the contractual bar on Hazara selling long shelf life tomato seeds to farmers in Mexico who would grow those seeds into tomatoes, and the tomatoes would then be imported into the United States. And the standard under the FTAIA. Yes. In our view, the effect is direct because this case is, in our view, on all fours, analogous to the Hartford case in which the Supreme Court found on the facts presented to it that the FTAIA was satisfied. In that case, there was a restraint imposed in London but intended to affect the United States. Here we have a restraint imposed in Mexico but intended to affect the United States. But isn't there a distinction on the facts in Hartford? Because as I understand it, the reinsurers in the London market were essentially imposing a restriction on U.S. insurers in attempting to make some changes in the insurance business in the United States by threatening, I guess what, to withhold reinsurance if they didn't make those changes. Yes, that's correct. It seems to be pretty direct. So how can you distinguish the facts in Hartford from the facts at Bar? I don't think they need to be distinguished. The restraint in Hartford, as you pointed out, was on reinsurance in the London market. But the effect was felt on primary insurance in the United States market. I see a direct effect there, but I'm still... Here we have, if Hazara cannot sell seeds to be grown in Mexico, no resulting tomatoes are grown or can be imported into the United States. United States consumers are deprived of the competition that those tomatoes would bring if they were allowed to be grown and to come into the market. Let me ask you about the state of the research on the seeds. Are you alleging that there is, in fact, a seed that Hazara has developed and is ready to sell to Mexican farmers that would produce the long shelf life of tomatoes that would then be sold in the United States? Or, I think the district court found, you were speculating that they would sell such seeds in the future, but had not yet done so. The district court did not make that finding. I think what you're giving me is the defendant's argument on that point. There's no finding to that effect. What Hazara, on the foreign side of the case, Hazara now has what it calls extended shelf life tomato seeds that could be sold in Mexico, could be grown into tomatoes in Mexico, and the resulting tomatoes, the bulk of them, would be exported to the United States. Now, where is that in the record? That's in Mr. Schwartz's declaration, among other places, which we believe the district court improperly overlooked. On the domestic side, what the district court treated as the domestic side of the case, you're correct, Judge Tallman, that there are no existing Hazara seeds that could be planted for winter open field cultivation in the United States. We don't think that makes any difference because antitrust law is clear that what matters is potential competition, not actual competition. So they've got the seeds that presumably will grow in Mexico, but they haven't developed a seed for growth in the southern United States. For large-scale winter open field cultivation, that's correct. They have greenhouses, other kinds of seeds, yes, currently do exist. And Mr. Schwartz points out in his declaration that under LSL's interpretation of the prescriptive clause, even those currently ongoing sales are barred. But you're correct otherwise, yes. So the point that I want to impress on you today with respect to the direct component of the FTAIA is that the Supreme Court in Hartford on the California and Connecticut complaints that were before it said we don't need to interpret the statute. The facts before us are sufficient to say that the FTAIA is satisfied. Therefore, if you have another case that's properly analogous to Hartford, the same result should obtain. And in our view, this case is properly analogous to Hartford. In fact, it's even a stronger case than Hartford because the linkage between tomato seeds and tomatoes is so close that they almost can't even be separated. Tomato seeds inevitably grow into tomatoes. I mean, it's the same product, really, in our view. Your allegation in the complaint was that the bulk of Mexican farm-grown tomatoes are shipped to the United States for marketing. Yes, but it's not just the allegation in our complaint. It's an undisputed fact in the excerpts of record that in the two export-oriented growing regions of Mexico, Sinaloa, which is on the West Coast, and Baja Norte, the vast bulk of the tomatoes that are grown in those two regions in the winter are grown explicitly for export to the United States. Everyone in this case knows that. Everyone knew it going into this agreement. It's been that way for several years now. And the whole point of growing long-shelf-life tomatoes in those regions is so that the tomatoes can get to Seattle and Pittsburgh and Las Vegas and all the other northern cities of the United States. That's the whole reason for growing the long-shelf tomatoes there. Now, Mr. Mintz, can we accept your argument without deciding whether direct codifies existing law or creates new law? I believe that you can, and that's the argument that I just made. The analogy to Hartford does not require you to interpret the FTAIA. As you recognize, we made alternative arguments in our briefs. The codification argument is our first alternative argument, and then we even had a second alternative argument as to what we think the proper interpretation of direct should be. But I submit that the Court need not reach those alternative arguments. The case can be decided and the district judge's order reversed on the analogy to Hartford. That would be sufficient. Now, the next question I have for you is that can we rule in favor of you, in favor of the government, by rejecting your per se argument and deciding this on a rule of reason? I'm not sure I follow your question, Judge Aldister. Are you referring to a particular, the domestic side of the case, the foreign side? Both sides. Well, we alleged a per se violation in our complaint. It was an alternative allegation. I know you do that, but I have trouble with your argument. That's why I'm asking the question, because I think that the Ninth Circuit case sort of forecloses that. Okay. My next question is, if we were to consider the overarching question, have you alleged and can you substantiate a rule of reason? The answer is yes, but let me go back for one moment, because I think you may, I hope you're not under a misapprehension. I believe you're referring to the Sammy case. The Sammy case, in our view, does not apply to the district judge's Rule 12b-6. That aspect of the district judge's order in this case. Sammy is a case that talks about foreign conduct, alleged foreign conduct. It has nothing to do with a domestic case. The district court here ruled under 12b-6 on a domestic side of the case. And so in our view, the district judge's failure to credit or take account of our per se allegation on the domestic side is an error, and Sammy does not affect that. I understand that, and I may be inclined to agree with you on that point. Okay. I saw no reason in this antitrust case or this case brought under the statute to delineate the domestic foreign, because I think they're mixed, under your theory, under the government's theory. Well, okay. What I had specific reference to was the Metro case. Right, right. As to the second part of your question, we did allege a rule of reason violation, and in our view the facts are more than sufficient. We sufficiently alleged it with, of course, the dismissal on the complaint stage. We think that we'll be able to substantiate a rule of reason violation. Well, when we start out on basic antitrust law, you apply the law rule of reason. Yes. Then you move from that to specific exceptions, which are per se. Yes. Okay. All right. You spent a lot of time on per se, and the point that I am asking you, that if we don't agree on your per se argument, have you averred and can you justify a rule of reason averment? Now, we're talking about averment. Really, I guess I'm talking about specifically at 12-6, am I not, or is it 12-1? 12-B-6, I believe. 12-B-6. Yes. And paragraph 7 of the complaint is a straightforward rule of reason allegation. Right. So it's plainly in the case, and we think that our market definition was sufficient for that. Where did the judge go wrong in his rejection of that? In his rejection of the? Rule of reason concept. Well, on the domestic side, he went wrong by concluding or believing, although the defendants never made this argument, that our market definition was overbroad. And in our view, that's not a basis for dismissal of a properly pledged complaint. Your argument is that it's broad, but so long as it includes what will be the facts, there's nothing wrong with it. There you are. Courts are properly skeptical that a plaintiff has gerrymandered a market definition to be too narrow. Right. But there is no case, and the defendants do not cite any, that justifies dismissal of a complaint for a market definition that is supposedly overbroad. It's just never been done. When the court said that you weren't specific enough, what was the court referring to? I'm not sure. It's hard to tell from the district court's order. I think maybe that the district court was confusing our market definition, which we think was a very plain and straightforward statement, and I'll reiterate it, seeds designed to grow fresh market tomatoes in North America during the winter months, with the background facts that we had alleged about the defendant's conduct, about the nature of the market, about Hazara's conduct. And he just seemed to confuse the two. We don't think there's anything unclear about our very simple statement of market definition. Could you read that again for me? Yes. It's paragraph 33 of the complaint. Seeds designed to grow fresh market tomatoes in North America during the winter months. We think that satisfies Rule 8A's requirement of a plain and straightforward pleading. We don't think there was any basis for the district court to dismiss that aspect of the case. Had the Swerkovitz case come down after the district court? You're correct. Swerkovitz came down in 2002. I believe it might have been just after. It's probably close, but it might have been after. And the rule there says that notice pleading is notice pleading. Exactly. You don't go to fact pleading in federal court. Exactly. And the Supreme Court made clear in Swerkovitz that there are only a few limited exceptions to that principle, and antitrust was not named as an exception. So we think we have clear error on the 12B6 side of the case. What were the exceptions? Fraud? Yeah, I believe fraud was one because you require a more definite statement. There may have been one or two others, but certainly not including antitrust. The rules call for it. That's right. I'll follow you. What about the economic harm allegations? Is it your view that there was no requirement to allege economic harm in the complaint? No. No, that isn't our view. We believe that we alleged harm to United States Commerce, which we are required to do. So just generally a broad assertion that there is harm to United States Commerce is sufficient in your view to defeat dismissal? Well, on the 12B6 side, we think our complaint was more than sufficiently detailed to do that. What portions of the complaint on the 12B6 side do you rely upon as asserting the economic harm? Well, we allege that the exclusion of Hazara, a major competitor in the market, harms competition by reducing competition. We think straightforward and under the antitrust law, this Court's decision in EW French, the D.C. Circuit's decision in Caribbean Broadcasting, the Yamaha case we cited, all support the proposition that if you eliminate a potent competitor in the market, that's a harm to competition. And economic harm? Well, that is a form of economic harm. So I guess that's my confusion. My question is, is it your view that no specific assertion of economic harm has to be set forth in the complaint? No, I don't think that's my position. I think we do have to allege a harm to competition, and we have to allege it for jurisdictional purposes, an effect on United States commerce, and we think we allege both. That wasn't my question. Okay, I'm sorry. My question was whether or not the complaint has to include a specific assertion of economic harm, not competition, economic harm. I'm trying to answer. I'm not really sure what you mean by economic harm. We allege harm to competition, and I think that's what we're required to do. Okay. I hope that helps. So your answer is no to my question. I think so, yes. Your answer is there is no requirement to specifically allege economic harm. And I'm just asking a question. Right. Is your answer yes or no? I think the answer is no. Okay. And I think our complaint was sufficiently allege harm to competition and to United States domestic commerce, and I think those are the requirements. So your position is that you would not be required to allege that the price of the seeds was affected or that the consumers would have greater choice of ripe tomatoes in the wintertime? You don't have to be that detailed. Is that your position? Well, we were. We did make that latter allocation, that by the exclusion of Hazara, consumers do have less choice for better fresh market winter tomatoes. And, in fact, we also alleged a price effect as well. All right. Let's talk about the price effect for a minute, and that is, as I understand it through the Rule 28J letter that the defendants submitted, there is some kind of an agreement that essentially blocks your argument that there would be an effect on price. Would you respond? Yes. I hope the Court received our response to the Rule 28J letter. Okay. If not, I have copies. We mailed it last Wednesday. I believe it was received in San Francisco on Thursday. My lockers say we have it. You do. All right. I don't believe that the defendants – I'll be honest. I didn't get it because I – Okay. The defendants submitted a Rule 28J letter last week that cited a – I read that. Right. I didn't get your response. Okay. We submitted a response. Our first point was – well, for clarification, this is an anti-dumping agreement that the United States Department of Commerce reached with growers and exporters of tomatoes in Mexico in late 2002. And it sets a reference price for the import of tomatoes. Our first point in our Rule 28J letter was we don't think that that has any relevance to our primary argument, which is that the exclusion of Azera bars – Azera tomatoes from coming into the United States and reduces competition in the United States. There's nothing – the anti-dumping agreement has nothing to do with that effect. Our second point was that the mere existence of the anti-dumping agreement, the fact that it was important enough for the Department of Commerce to negotiate this, shows that imports of tomatoes from Mexico and the price of those tomatoes is important to United States domestic commerce and has a substantial effect on United States domestic commerce. So we think, actually, the existence of this agreement redounds to our favor. The – Judge Tomlin, the argument that you asserted was not made in the defendants' – I don't know that they are actually making that argument. They didn't assert it. I'm going to give them a chance to explain it. They didn't assert that in their letter, that's for sure. Just as a matter of curiosity, how did this matter come to the attention of the government? I believe that back in 1997 or so, about a year and a half after the restrictive clause took effect, Azera brought it to our attention. And then, Mr. Mitchell, I was also going to ask, was there some reason why the government chose not to amend its complaint? We – well, we thought that our market definition was adequately pled and that there was no reason to replead and we did not feel that we should go forward on half a case because the district judge divided the case into two parts and we didn't want to proceed on half a case. We thought we had an adequate – You ended up in the circuit. Anyhow, you wanted the whole case to get here. Exactly. And as we pointed out in our brief, his order created an ambiguity as to whether we had a final appealable order or not. And so we proceeded to make it final and appealable. And I take it then, based on your answers to Judge Rawlinson's questions, that if you were given an opportunity to replead, your definition of the market would be no different. It would be no different. We think it was perfectly adequate as pled. All right. Thank you. Thank you, Mr. – I'm going to give you some extra time here. This is an important case and we want to be sure and understand. Thank you very much. Just before you leave, just to help me out. Yes. In the averment about 70 percent of the market, who were involved in that? That's correct. Our allegation in the complaint that the defendants collectively, that's both LSL and Seminis, have more than 70 percent market share in the market as we alleged it. Okay. In North America? Well, that's the geographic market that we alleged, North America. Correct. Yes. Okay. Thank you. Thank you, Mr. Mintz. We'll hear from LSL Biotechnology. Good morning, Your Honors, and may it please the Court. My name is Thomas Connell for LSL. Let me start by saying that the government began by saying that its complaint was dismissed and that it didn't have an opportunity to present its side of the story, its facts. In fact, the record below, as the Court well knows, is very extensive. There were extensive submissions by all sides, and the reason the government's complaint was dismissed is because it is fatally flawed at the center of it. The allegation that counsel read to the Court is of crucial importance, and you have to look at it very carefully. It's from paragraph 33 of the complaint. The government alleges that the relevant market is seeds. They don't say what kind of seeds. Seeds designed to grow fresh market tomatoes in North America during the winter months. They didn't tell the district court judge what kind of seeds were involved. I mean, obviously tomato seeds, but there are many, many types of tomato seeds, and only some of them are relevant to this dispute. They didn't tell the district court judge anything about geography, other than that this involved North America. Well, North America encompasses a huge area with many, many different possible relevant markets, as the district court judge noted in a footnote. They didn't even tell the district court judge what time of the year they were talking about, other than winter, and I note that winter is never defined, but I note that in the government's papers to this Court, they're now talking about non-summer tomatoes, which is a season that could conceivably be nine months rather than three months. So you're making the argument that there is no case that says, well, if we under-define the market, you might be able to dismiss us, but if we are over-inclusive in our definition, that's good enough. It's not good enough, Judge. It certainly gave the district court judge grave problems. The district court judge had to fish around to try to figure out what market was being alleged, and what the court found was, giving the government the benefit of the doubt, that there were two possible markets that were alleged. There was one that was a clear market, which is Mexico. Mexico is the only place where LSL seeds are sold. It's the only place where seeds, long shelf-life variety seeds, can be grown in the open fields during the three winter months, and it's the market where all the economic activity occurs. So the district court judge said, well, look at that market, and we'll look at long shelf-life tomato seeds, and then we'll look at the other market, what I call the phantom market, the fictitious market, the domestic market, where there are no sales, no seeds, and no market at all. So you are saying to us that under notice pleading, when you received this complaint in Toto, you didn't know what kind of seeds they were talking about. And when you received this complaint, and they were talking about the operation of the American antitrust laws and the statute, you did not get sufficient notice. Is that right? It's not that I didn't get sufficient notice. Well, the whole concept of notice pleading, I'm starting out. I'm surprised at the first thing that you are saying, that you didn't know what seeds were. They weren't talking about apples or oranges. They were talking about tomatoes throughout. I understand. Let me make it clear, Judge. There are many different varieties of tomato seeds. There are only some of which are prohibited by what they call the restrictive clause, which is not, by the way, a restrictive clause. It's a judgment of an Israeli court. But there are only certain types of tomatoes. That does not cover, for example, greenhouse tomatoes, which have a different kind of seed. It does not cover cherry tomatoes. It only covers certain types of seeds. Even within tomatoes, there are different seeds for every climate, both in the United States and in Mexico. I did not have much difficulty in reading your brief and the government's brief that you were talking about longer shelf-life tomatoes, and that is what this case is all about. I was wrong then by reading your brief and the government's brief. No, Your Honor. I don't mean to overstate it, that it's impossible to know what type of seeds. Obviously, we're talking about tomatoes. Here is the thing. We are here on a 12-6 and 12-1. We're not here on summary judgment. I understand. We are here, and we are under this notice-pleading situation, and I speak from the standpoint that I think that notice-pleading is abomination and that one of the serious problems in the increase of the delivery of legal services is because of the expensive discovery because of notice-pleadings, but that's a personal view. The Supreme Court has spoken before, and now this year it made it very specific that you don't have to be specific in your pleadings. But there's a certain need. And that is your main complaint? No, Your Honor. Let me say, first of all, that the district court judge who was an able and experienced district court judge had a great deal of difficulty. He didn't understand exactly what kind of seeds were being pledged, and it makes a great deal of difference. He didn't understand what part of the country, what part of the hemisphere was being pledged. And I think he made every effort to do so, and he gave the government the opportunity to amend the complaint to specifically address that. And the government rejected that opportunity and decided that it would rather have the case decided by different judges. I've never seen a case where a district court judge has allowed a party whose complaint is being rejected to amend, and they've bypassed that and gone to the Court of Appeals. With respect to the question of geography, the definition of market is extremely important because these seeds only grow in Mexico. Nobody can grow seeds of this nature, long shelf life seeds in the United States. Everybody would like to. Well, generally, the question of market is that the market is defined too narrowly. Here the argument is that the market is defined too broadly. Correct. And the market definition is extremely important. As the court, the Ninth Circuit said in the McGlinchey case, and admittedly, they were not talking about the complaints that stayed, but they said that proof that the defendant's activities had an impact upon competition in a relevant market is an absolutely essential element of the rule of reason case. You cannot analyze the rule of reason case without knowing what the market is. The district court judge couldn't figure that out. And that is principally because the geographic scope of the alleged market is so big that it encompasses a foreign market where the rules of the FDAIA apply and limit the jurisdiction of the court and included this alleged domestic market. Now, I'd like to speak about the rule of reason. There were several questions about that. First of all, I should say that the government makes the extraordinary statement that this is a per se case and that it pled a per se case. That's just flat wrong. The government never pled a per se case. If you read the government's complaint, you will never see it. They use the word what? Naked something. Naked restraint. That's not the same thing as per se. The government knows how to allege a per se complaint. They didn't do it here. The district court didn't. There were numerous papers that were filed. Even if they had alleged that the Metro case seems to be against that. Absolutely, 100 percent against it. And there are numerous quotes. I won't go through them. I'm sure the court is familiar with that. But it is a devastating rejection of a per se case. Of course, the government doesn't agree. The government argues that Metro can be distinguished. But for the purpose of this argument, I think that we have to proceed. I'm just speaking for myself. We have to proceed under a rule of reason. If you look at this case under a rule of reason, the starting point is to look at what is being restricted, at the so-called restrictive covenant, which, as I said, really is not a covenant, in the sense that parties got together to try to divide up the world and help themselves. What was going on here and is undisputed, because there are a lot of facts that were before the district court, because I should say, as an aside, this was also a 12b1 case. With respect to all of the claims at issue here, there was a 12b1 motion to dismiss, and the court was entitled to look at the facts outside the complaint. With respect to the restrictive covenant, I mean, the government says that it was kind of a cooperative agreement among these parties. But it wasn't. The 12b1 is that it doesn't meet the statute because of the statement of direct. Is that right? Yes, and that there's no antitrust agreement. The rule of reason, of course, we're talking about the 12-6. No, no, no. The rule of reason applies to both. To both. To both. I wasn't quite sure what your position was on that. You are saying that the rule of reason applies to both, and the government did not meet the burden of giving us enough information. That's correct, to establish subject matter jurisdiction. That's true with respect to the foreign market of Mexico and the alleged domestic market. And to understand the rule of reason, you have to look at the reasons for this restrictive covenant. It was entered because my client, LSL, had developed a technology that it gave to Hazara. It turned it over to Hazara, and that's the only competitor in the world that had access to this technology. And it was not just know-how. We're talking about germ plasm. That is to say, the fundamental organic matter that produces these tomatoes was turned over to Hazara. And in my client's view, and I'm not here to argue this, but my client's view is that as a result of that turning over, that Hazara abused that relationship, that Hazara cheated, that it stole the technology, it misused it all over the world. The restrictive covenant that was put in place was put in place not to carve up the world, but to protect my client from one competitor that had stolen, in its view, its technology. And that question, as to whether the technology was stolen and who owns that technology, is now before an arbitration panel in Israel being supervised by the former Chief Justice of the Israeli Supreme Court. Counsel, do you agree with opposing counsel's position that there is no need to allege any economic impact in the complaints? No, I don't agree with that. Antitrust injury is an essential element. The injury that's alleged in the complaint is variously an injury to taste, but not an injury to any kind of economically cognizable, not in an economically cognizable way. When you look at the injury in this case, the injury is at most speculative. I mean, you have undisputed evidence before the district court that the cost of a tomato seed is less than 1% of the cost of a tomato in the United States, and you have a statute that says that there has to be a substantial effect in the United States before the federal district court has any jurisdiction. That's not a substantial injury. The government didn't properly allege injury in its complaint, and when the facts were examined with respect to injury, they were not sufficient to meet the standard. They have alleged that your clients have 70% of the market of long shelf-life tomatoes in the United States. There is no market in the United States, Your Honor, for long shelf-life tomatoes during the winter months. It does not exist. The government's own brief to this court on page 6 acknowledges that you cannot sell these seeds in the United States. The government's affidavit submitted by the Hazara representative also states that they're trying very hard, and I might add in violation of the restrictive covenant, they're trying very hard to develop a seed that can be sold and grown by American farmers in the United States during the winter, but they haven't been able to do that. I meant from the standpoint of the consumers in the United States. I'm sorry, I misunderstood. Are you talking about the tomatoes or the seeds? I'm talking about the tomatoes, from which the seeds are there to grow tomatoes. This whole matter is about the effect on the consumers in the United States. Isn't that the whole basis of the government's argument? That is the government's argument, Your Honor. We're coming into the aluminum company case with a learning hand, narrowing down the banana case saying if there is activity in a foreign land that has a direct effect on American consumers, the antitrust laws apply. Isn't that their basic theory? No, the government's basic theory is that it doesn't have to prove a direct effect, that the Hartford case gave them permission not to prove a direct effect, and that's totally wrong. There is no direct effect, and the government utterly misreads the Hartford case. The Hartford case had nothing to do, provides no support for the government. In the Hartford case, and the court discusses Judge Hand's opinion and discusses the banana case, in the Hartford case, the defendants, the reinsurance companies in London, expressly conceded that the court had jurisdiction, and they had to make that concession because there was overwhelming evidence that there was a direct effect, and the court in footnote, I think it's 23, said that they were not going to reach the question of whether or not there was a direct, substantial, or reasonably foreseeable effect in the United States. They didn't have to reach it. They were not going to pronounce on it. Well, I thought that the government was saying, look, first, the Supreme Court has a met this issue, and the rest of the courts of appeals are punting when it comes to the issue, but at best, the word direct represents a codification of existing antitrust law, and what it means is proximate cause, and that has been implicit in the whole jurisprudence of antitrust. Isn't that their position? That is their position, but the Hartford case doesn't provide them any support for that, whether I agree or not. The Supreme Court of the United States certainly didn't agree with that in Hartford, and indeed, as we cited in our brief, in Hartford, they sidestepped that issue, but in the Republic of Argentina case, a unanimous court in an opinion by Justice Scalia defined direct effect with respect to the FSIA, the Foreign Sovereign Immunities Act, which similarly has a jurisdictional element saying that you have to have a direct effect, and when they did that, they said, the unanimous court said, an effect is direct if it flows as an immediate consequence of defendant's activities. The activities here are selling seeds that are manufactured and produced in Israel, selling them to Mexican farmers, and all the conduct ends there. There is no direct effect. There is no immediate consequence on the United States consumers by selling those seeds in Mexico. LSL is out of the picture once those seeds are sold. If the farmers in Mexico found out that they could get a better price by selling the tomatoes they grow with those seeds to the Japanese market, you can be sure they would do that in a minute. They sell them, most of them, not all of them, to the American market because that's where the best price is, but those seeds and the product of those seeds are the farmers, and they can do with them what they wish. One other point to return for a second to the restrictive covenant. I might point out that the restrictive covenant has two sentences in it, and when the government talks about it, they talk about it as though there were only one sentence. The restrictive covenant is actually set forth on page 12 of our brief, and what it says very plainly... Is this subparagraph K? Yes, it is, John. All right. What it says very plainly is contrary to what the government has said. This does not impose some kind of a bar on Hazara from ever competing in North America. What it says in the first sentence is that, yes, there is a... Hazara cannot engage directly or indirectly, et cetera, with others. And then in the second sentence, what it says is that if Hazara has a product that it did not steal from LSL, I admit it doesn't use those exact words, but a product that it develops, a seed that it develops that was not part of the package of rights and goods and germplasm and knowledge that it obtained from LSL, it can notify LSL that it has that product and ask LSL for authority or permission to use that product. And LSL cannot unreasonably withhold its permission. And so when we talk about the rule of reason, we have to take into account that this is not the, quote-unquote, naked restraint that the government is talking about. This is an order of an Israeli court that basically said that if you own the product, LSL, you are entitled to the rights and the property of that product. And the one party, Hazara, that was given access to it has no authority to go out and sell it. This is fundamentally a property dispute of an intellectual property and know-how, not an antitrust dispute. And we tried in our motion to the court, in our motion to stay the case unsuccessfully, we tried to alert the court to the fact that there's a matter going on in Israel now that will fundamentally determine whether there are any kinds of seeds that Hazara could develop that would satisfy this restrictive covenant. There may be. We don't have the answer to that yet. So far, Hazara has not requested or provided notice under this provision that they have a seed that they think meets the requirement. They have never done that. They have never done that. And I might say that the undisputed facts are that this clause has not stopped Hazara from doing anything. When they submitted, when the government submitted an affidavit from Hazara's representative, it was one of the most extraordinary things because Hazara's representative is saying, we're going right out and violating this restrictive clause with impunity. We're selling 10 percent. We're selling tomato seeds, including long shelf-life tomato seeds, to the Mexican market, and we now have 10 percent of the market. That's what the affidavit of Amir Schwartz states, and that they're going ahead and trying to develop a market in the United States for these seeds. That's directly contrary to this restrictive covenant. So when the government says to the court that, oh, it's a terrible thing that we're restraining Hazara, it can't develop this wonderful seed that would have a better quality and better tasting tomato, the fact is that Hazara has not been restrained at all from doing that, and the government's own evidence establishes that. If Hazara could develop a better seed that would meet the requirements or the tastes of the consumer in the United States, you can bet they would have done it. We would have had a different affidavit than the one that Mr. Schwartz submitted. It would have been one that said, we have seeds, we've test-tried them in the United States, and we've done a consumer survey, and everybody loves these tomatoes, and they're much better. They haven't done that. They haven't done that because nobody has done that. We submitted in the district court undisputed evidence that there were at least 12 other companies, leaving Hazara aside, 12 other companies that have an enormous incentive and are trying to do exactly what the government says Hazara is trying to do. LSL is trying to do it. Everyone would love to grow long, shelf-life tomatoes in the United States during the winter months. No one has been able to do it, and this clause has not restrained LSL from doing so. I'm sorry, I went way over my time. I'll give you a little extra. Is there anyone else? I see we've got, is it Mr. Bala listed? No. No one else is speaking from our side. I'm going to give Mr. Mintz a couple extra minutes, so if you have anything further you want to say, I'll give you the same amount of time. Just to return for a second to judge all the search questions at the beginning, I mean, I think it's important to look at, both to look at the record in this case, because it was a 12b1 complaint, and all, 12b1 and the court is entitled, the district court was entitled to look at the record, and to look at the express language of the complaint, because alternatively we asked to dismiss based on 12b6. And with due respect, I would suggest that, of course, anyone reading this complaint would know that it's about tomatoes, of course anyone would know that it's about tomatoes grown during the winter, but it is fundamentally important in assessing the economic power of the parties, assessing the reasonableness of the restriction, of the alleged restriction, to know whether we are talking about a market that exists only in Oceanside, California, and I picked that because that's one place where people have tried, in the United States, very hard to grow tomatoes there, or whether we're talking about Boston, Massachusetts, where no one will ever be able to grow a tomato in the winter months. The government, when it alleges antitrust cases, routinely alleges specific markets, numerous markets, sub-markets, micro-markets in the United States. And here what they've done is to say, we're just going to talk about North America. They did that very deliberately. The government lawyers are very able lawyers, and they didn't make the choice to talk about North America because they couldn't figure out what the right place was. They did that because they were trying to slip by the jurisdictional test for jurisdiction in this court. They knew that if they alleged a Mexican market, it would be subject to the direct and substantial effect test, and they would probably lose, as indeed they did. And they knew that if they alleged a domestic market, even if they just alleged the United States, that there is no market, and the evidence would show there was no market, and they would lose that way. So what they did is they submitted a complaint that talks about North America, that talks about seeds, not talking about which ones can be grown, which ones are proprietary, which ones aren't. And I don't want to disparage what they've done. It's very clever. But there's a certain amount of sleight of hand here, and the sleight of hand is something that I think the district court was attuned to because the district court tried to divide the market up and analyze it piece by piece and then gave the government the opportunity, when the district court found that there was no market, no domestic market, gave the government the opportunity to replete specifically a domestic market. And the fact that they did not take that market is, I think, very telling. It tells you that, you know, that they were playing poker with no good cards, and if they had the lamb on the table, they would have lost. And I apologize again for going over. Thank you, Mr. Chairman. Thank you. Are you ready to quit? No. No. We were conservative deliberately in our market definition, precisely because we wanted to avoid disputes and ambiguities about it. Any suggestion that there was sleight of hand or anything underhanded about our market definition, there's no support for that allegation in the record, and the district court made no finding to that effect. We think we tried to be broad to be safe so that we wouldn't be accused of having artificially narrowed the market. And that was the reason for alleging it the way it is. And North America, simply because everyone in the case knows that there was an aspect of the case about tomatoes being grown in Mexico and then imported to the United States. So North America encompasses both the United States and Mexico. I'd like to respond to some of the other points just raised by opposing counsel. Hazara is indisputably a potential competitor in this case, and under established antitrust law, that is all that's sufficient. That is sufficient. On the domestic side, we don't need to show that Hazara has seeds that it can now sell in the United States. We alleged and properly alleged that Hazara is a potential competitor, and under Supreme Court authority, and even more recently the D.C. Circuit's en banc decision in Microsoft, that's sufficient. If you try to squash a nascent potential competitor, I'm quoting from the D.C. Circuit's opinion, that is a sufficient allegation. Mr. Connell read to you portions of the restrictive clause. We think that the clause puts so many restrictions and conditions on Hazara that it effectively amounts to a bar. Whether it does or not or the degree to which it does or not is not a question to be faced at this time on the pleadings. That's really an issue for discovery or summary judgment, so we don't think that that argument hurts us at this stage of the case where we were dismissed on the pleadings. Mr. Connell referred to the FSIA, the Foreign Sovereign Immunities Act. Nothing in the case law, nothing in the legislative history of the FTAIA gives any indication that Congress was looking at or ever thought about the FSIA when it created the language of the FTAIA. We think that that's just a red herring. On market, on the intellectual property aspects of the case, an anti-competitive, non-compete agreement, which is what we have here, is not justified by allegations of theft of intellectual property. It's that simple. Mr. Connell referred to the arbitration that's going on in Israel. That is not an antitrust enforcement action. It would not resolve all aspects of this case. It's proceeded very slowly, and, in fact, in our opposition to their motion to stay in this court, which is their motion was denied, and in our attempts to expedite the hearing of this case, we pointed out facts to show that LSL has, in fact, manipulated the arbitration in Israel so that it is moving as slowly as they can possibly make it move. So we don't think there's any reason to wait for an arbitration that's not going to resolve any issue of U.S. antitrust law. Okay, Mr. Mintz, I think your time is up. Thank you very much. This just argued is submitted, and we'll get you an answer as soon as we can. On a personal note, Mr. Solomon, I've heard arguments in antitrust cases, I guess, now for 35 years, and I must say that this was one of the finest arguments I've ever had on both sides. It's just a great pleasure to have such great counsel in this case. We would echo that sentiment. Thank you all. All rise. Questions adjourned.
judges: Aldisert, Tallman, Rawlinson